UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

JOSEPH CHRIS ZORN,

Plaintiff,

v.                6:09-cv-81

PRINCIPAL LIFE INSURANCE
COMPANY,

Defendant.

## ORDER

### I. INTRODUCTION

Invoking 29 U.S.C. § 1132(a)(1)(B), Plaintiff Joseph Chris Zorn ("Zorn") seeks judicial review of a disability benefits termination decision by his disability insurer, Principal Life Insurance Company ("PLIC"). *See* Doc. 1 at 1. This case is before the Court on Defendant PLIC's "Motion for Judgment on the Record," *see* Doc. 63, and Zorn's "Motion for Summary Judgment," *see* Doc. 65.

The Court resolves both motions in a Rule 52(a)(1) trial on the papers. *See, e.g., Miller v. The Hartford Life & Acc. Ins. Co.,* 2010 WL 1050006, at *6 (N.D. Ga. Mar. 17, 2010); *Bates v. Metro. Life Ins. Co.,* 2009 WL 2355834, at *1 & n.1 (M.D. Ga. July 29, 2009).

### II. FACTS

Effective April 1, 1988, PLIC issued Group Policy No. GLT 53080 to the Trustees of PIA Services Group Insurance Fund, under which long-term disability insurance was provided to eligible full-time employees of Members of the National Association of Professional Insurance Agents. *See* Doc. 63-2.

Zorn, as an employee of a member agency, received coverage under the policy effective March 1, 1990, with a monthly benefit of $2000. *See* Doc. 63-3 at 2457. Zorn was employed as an insurance agent and owner of Zorn & Son Insurance Agency ("Zorn & Son") at the time. *See id.* at 2948.

Zorn did not graduate from high school and worked in the insurance business from 1974 until 1994, when he became disabled. *See* Doc. 65-4 at 2, 4 (Zorn Affidavit).

Zorn was also involved in other businesses. One such business was Zorn-Land, Inc. ("Zorn Land"), which bought real estate for investment purposes. *See id.* at 8. Another was Payroll and Accident Control Services, Inc. ("PAC"), which provided leased employees and other services to customers. *See id.* at 8-9.

The underlying policy is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* Doc 1 at 1. The insurance policy defines "Disability" as:

> An Eligible Person's inability, because of sickness or accident, to perform the material duties of his or her occupation (while under the care of a Physician):
>
> a. for the first five years of disability, at his or her normal job; and
>
> b. following the first five years, at any job that reasonably fits his or her background and training.

Doc. 63-2 at 12 (Insurance Policy).

Zorn was diagnosed with interstitial cystitis in February 1993 and later with pelvic floor dysfunction. *See* Doc. 63-3 at 2950, 3315. Dr. Robert J. Evans, an urologist who specializes in Zorn's disease and who has been the primary physician in treating Zorn's interstitial cystitis disease and pelvic floor dysfunction, described these diseases as follows:

Interstitial cystitis is a complex condition also known as Painful Bladder Syndrome or Bladder Pain Syndrome. It is characterized by severe, unrelenting pain in the bladder causing a constant urge to urinate. It feels like a urinary tract infection at all times even though the urine in patients with IC tends to be uninfected. The root cause of the condition is a damage [sic] or poorly functional bladder lining layer. This layer, known as the glycosaminoglycan (GAG) layer serves to protect the bladder tissue from the toxic effect of urine which is acidic. It is not clear why the GAG layer is poorly functional in IC patients, but the end result of the bladder being exposed to the acidic urine is pain, and an overwhelming, constant need to void. Patients with this disease like Mr. Zorn often need narcotics to deal with the pain. As for the problem with urinary frequency, many patients have to spend all day in the bathroom because they have an urge to go when there is only a few drops in the bladder. It is not unusual to see someone attempt to urinate 60 or more times in a day. In an attempt to stop urinating so frequently, patients like Mr. Zorn will develop a dysfunctional pelvic floor where they lose the ability to relax the muscles used to hold in urine and because of this external sphincter spasm, they cannot void normally and have to insert a catheter to empty the bladder.

Everyone has a pelvic floor which consists of the sphincter muscles that open and close our urethra and our rectum and allows us to control urination and bowel movements. In persons suffering from interstitial cystitis the pelvic muscles and sphincters become constricted and tight, with very high tension such that the muscles cannot relax enough to have normal bowel movements or normal urination. This tension is called high-tone pelvic floor dysfunction and causes pain throughout the entire pelvis due to muscle spasms.

Doc. 65-2 at 6-7 (Dr. Evans Affidavit).

Zorn submitted a claim for total disability to PLIC, indicating his date of disability as August 19, 2004. *See* Doc. 63-3 at 321. At the time, Zorn's duties at Zorn & Son required that he:

(1) Engage in conversations with customers, both by phone and in person at the office, regarding insurance matters; (2) Engage in conversations with insurance company representatives, primarily by phone, regarding insurance applications, coverages, claims and other matters; (3) Completion of appropriate documentation, such as policy applications, both for customers and insurance companies; (4) Make phone calls on business customers at their business locations to consult with regard to insurance needs and coverages; (5) Supervise other salesmen/producers, office secretaries and clerks; and (6) Review financial documents and reports, both from insurance companies and in-house documents.

*See* Doc. 65-4 at 14 (Zorn affidavit). PLIC accepted Zorn's claim on September 18, 1994. *See* Doc. 63-3 at 2935. The parties dispute what Zorn told PLIC upon filing his claim. Zorn informed PLIC that he was a member of the local board of education and that he received $200 a month for the

position. *See* Doc. 79-2 at 2. Zorn claims that he also informed PLIC, by phone, that he was chairman of his businesses' boards of directors and he would be advising those corporations and reviewing their financial material as needed, and that he was his church's treasurer. *See* Doc. 65-10 at 12-13. PLIC denies that Zorn informed it of these additional circumstances. *See* Doc. 74 at 14.

On April 4, 1995, Zorn submitted an application to South Carolina for an agent's "continuing insurance education exemption." *See* Doc. 69 at 100 (Zorn Deposition). On August 16, 1995, Zorn applied for license renewal in Alabama. *See id.* Zorn indicated that he renewed his licenses hoping that he could return to work. *See* Doc. 69-1 at 1 (Zorn Deposition). Zorn stated that he later let his Georgia license go inactive. *See id.*

In 1996, Zorn signed an agreement with his brother Robert Rhett Zorn ("Rhett") making Rhett the owner of half of Zorn & Son. *See* Doc. 63-3 at 3639-42. Rhett also became an employee of the agency. *See id.* Rhett had quit his job at Georgia Power's Plant Hatch to join Zorn & Son. *See* Doc. 65-4 at 6 (Zorn Affidavit).

In August 1996, Zorn asked Auto-Owners Insurance Company to renew his non-residential agent appointment in South Carolina. *See* Doc 69-1 at 1 (Zorn Deposition).

In February 1997, Zorn again applied for renewal of his Alabama license. *See* Doc. 63-5 at 4.

In 1998, Zorn went on a hunting trip to South America with his former son-in-law. Doc. 63-13 at 63 (Zorn Deposition); *see also* Doc. 63-3 at 3827-28. The trip itself lasted a few days. *See* Doc. 63-13 at 63 (Zorn Deposition). Due to his condition, Zorn's hunting on the trip was limited. *See id.*

Sometime in 2003, Zorn and his wife Deborah, who also worked at Zorn & Son in a managerial capacity, had a falling out with Rhett Zorn. Zorn claims that he ultimately pushed Rhett out of the business because "(1) he had ceased trying to work amicably with my wife, and (2) he was not producing income for the agency that justified him staying." *See* Doc. 65-4 at 6 (Zorn Affidavit). Rhett claims that Zorn had always planned to force Rhett out as soon as Zorn's son was ready to start at the agency. *See* Doc. 63-3 at 3339, 3828-29.

In 2003, Zorn's Georgia insurance license expired. *See id.* at 3506-09.

On February 13, 2003, PLIC received a call from Carolyn Zorn ("Carolyn"), Zorn's sister-in-law and Rhett's wife. *See* Doc. 63-3 at 3690-92. Carolyn reported that Zorn was working for Zorn & Son both in-office and at home, but worked primarily from his home after Carolyn confronted him about his work activity and his disability claim. *See id.* She accused Zorn of "filtering" money through his wife and attempting to hide income as "rent expenses." *See id.* at 3691.

She also indicated that Zorn still owned and operated Zorn Land. *See id.* Carolyn claimed that Zorn bought and sold land and drove a bulldozer for the company. *See id.*

On March 18, 2003, Carolyn again contacted PLIC to inform them that Zorn was working at the insurance office. *See id.* at 2789. According to her, Zorn would come into the life insurance office "after lunch every day because he does his other work in the mornings" for Zorn Land. *See id.*

From March 17, 2003, to March 20, 2003, PLIC had surveillance conducted on Zorn. The investigators discovered that Zorn spent no more than a few hours at Zorn & Son's office over the course of three days.

*See id.* at 3085. Two later investigations failed to locate Zorn at the office. *See* Docs. 66-11; 66-13.

Carolyn contacted PLIC again on March 21, 2003 to inform PLIC that Zorn was buying Chris's share of the business and that Zorn's son Chris was taking over Rhett's duties. *See id.* at 3568.

On April 29, 2003, in an interview with PLIC, Zorn stated that, while he was working with Zorn & Son, he described himself as "owner/producer/manager" and focused 100% on sales, while his wife Debbie ran the office and handled personal lines. *See id.* at 3533. Zorn claimed that due to his disability, he became Chairman of the Board of directors for the company so that he might still have a voice in company activities. *See id.* According to Zorn, this activity took an hour a week, and he received no salary. *See id.* Zorn also claimed that he had not sold an insurance policy in the last ten years and had given up his insurance license in 1994. *See id.* Zorn claimed to have no stock ownership in Zorn & Son. *See id.*

In the same interview, Zorn claimed that he participated in no work activity for Zorn Land, other than "riding &walking around looking at the [40 head of] cattle" that Zorn kept at his house for the company. *See id.* Zorn purported to have held 50% ownership of the company at that time, and no other salary. *See id.*

Finally, Zorn claimed to have no more involvement with PAC. *See id.* He also alleged that he had no more involvement "in any land development for either business or residential in the Vidalia area." *See id.* at 3537.

In October 2003, PLIC asked Zorn to undergo an independent medical examination by Dr. Lancing Patterson, a board certified urologist who does not specialize in Zorn's disease. *See id.* at 3430. Dr. Patterson noticed that Zorn "did not appear uncomfortable and did not request to urinate one time" during the one hour and forty minute examination. *Id.* at 3433. Dr. Patterson reported:

> Based on face to face time with Zorn, plus additional time in the examining room totaling approximately an hour and 45 minutes, Mr. Zorn remained comfortable, did not have to urinate, and interacted at length. Based on this it would seem feasible to me that Mr. Zorn could work in a sedentary setting doing paperwork, talking on the telephone, etc. This is in effect what we did for over an hour and a half at a single stretch and Mr. Zorn did not appear to have any difficulty during this time.

*Id.* at 3431. Dr. Patterson also suggested that Zorn might not be motivated to improve, in part because of his enjoyment of his narcotic regimen. *Id.* Regarding Zorn's other abilities, Dr. Patterson found that:

> I did not assess his ability to stand or walk, although interstitial cystitis generally is not affected by body position. With respect to his ability to lift and carry, I do not see any reason for physical limitation. With respect to his ability to drive, I would suggest that the only limitation at this time is his narcotic use.

*Id.* Dr. Patterson noted that while Zorn's diagnosis of interstitial cystitis was appropriate considering Zorn's history, the diagnosis was "in many ways a diagnosis of exclusion and based upon history." *Id.* at 3430. Dr. Patterson gave four examples of newer treatments that he thought would be beneficial for Zorn. *See id.*

Zorn took issue with some of the factual assertions in Dr. Patterson's report. *See id.* at 3234-35. Zorn claimed that he went to the bathroom four times during his visit with Dr. Patterson, including once by recommendation of a nurse. *See id.* at 3235. Zorn also claimed that he had actually tried three of the four treatments that Dr. Patterson suggested. *See id.*

In November 2003, Carolyn sent PLIC articles from a local newspaper indicating that Zorn had appeared at meetings of the Lyons City Council. *See id.* at 3435, 3439-44. The paper reported that at one such meeting, Zorn participated in a lengthy discussion regarding city development of a water supply in a subdivision that he was developing. *See id.* at 3440. Zorn expressed a desire to come back to the council as needed. *See id.* Zorn met with the council on numerous occasions afterwards. *See* id. at 3441-43. Zorn later acknowledged his success in obtaining water for his subdivision. *See* Doc. 70 at 61-62 (Zorn Deposition).

On December 2, 2003, Zorn's attending physician, Dr. Geoffery Conner, responding to PLIC's request to review Dr. Patterson's report, stated that:

> Based on his history and reports I have reviewed, [Zorn] has tried a wide variety of medications to help control his pelvic pain with his current regimen being the only thing that has been successful. I do not specialize in interstitial cystitis and there may be other treatment modalities which would be more successful. I would support Mr. Zorn seeing a specialist dealing with interstitial cystitis to explore these other treatment options. If however these fail to control his symptoms it would be difficult to see him performing even sedentary work

> given the medications he currently requires.

*See id.* at 3360. In a later affidavit, Dr. Connor declared, "[b]ased on my personal knowledge of Mr. Zorn and his medical conditions, it is my medical opinion that Mr. Zorn is totally disabled and unable to perform the work required of any job of which I am aware." *See* Doc. 65-3 at 4 (Conner Affidavit).

A series of emails written by Zorn and intermittently sent from October 2003 to November 2003 indicate that Zorn was involved in Zorn & Son's and Zorn Land's businesses. *See* Docs. 69-3 at 8-50 (Zorn Deposition); 69-4 (same); 69-5 at 1-18 (same).

In a January 29, 2004 interview with one of PLIC's agents, Zorn admitted to operating caterpillar heavy equipment "from time to time . . . for 30 minutes or so but when he does anything physical like this he then pays for it with increased pain." *See* Doc. 63-3 at 3344. Zorn also admitted to having purchased some bulls but said that he had sold his cattle due to his inability to care for them. *See id.* at 3343. Zorn hired someone to care for the bulls. *Id.*

According to the agent, Zorn excused himself four times over the course of this two hour interview "presumably to use the bathroom." *Id.* at 3345. The agent also noted that Zorn appeared pale and thin, but alert and very astute as to the workings of Zorn & Son. *Id.* Zorn claimed that this was due to his wife's and son's updates concerning the business. *Id.*

Rhett and Carolyn met with the same agent on January 28, 2004. *See id.* at 3337. They indicated that Zorn still did all of the record keeping for the insurance agency and that he spent many hours at the office in the last week of December 2003. *Id.* They also indicated that Zorn ran PAC. *Id.* Rhett

5

reported that Zorn still worked primarily from home. *Id.* at 3338. Rhett and Carolyn also stated that Zorn operated caterpillar heavy machinery. *Id.* at 3339.

Dr. Evans first examined Zorn on March 8, 2004. *See* Doc. 65-2 at 2 (Dr. Evans Affidavit). On that visit, Zorn complained of "constipation, penile pain, erection problems, and urinary urgency and frequency. . . . difficulty voiding, abdominal pain, episodes of urinary retention, nausea, vomiting, and other constitutional symptoms." *Id.* at 3. In order to evaluate Zorn, Dr. Evans injected a solution directly into his bladder, which provided Zorn with "some degree of immediate relief." *See id.* at 4. Dr. Evans confirmed Zorn's diagnosis of interstitial cystitis and pelvic floor dysfunction. *See id.* Dr. Evans also diagnosed Zorn with fibromyalgia. *See id.*

Dr. Evans taught Zorn self-catheterization and recommended that Zorn receive an "InterStim implant," which "uses gentle stimulation of the third sacral nerve to decrease the signals coming from the bladder and heading to the spine and brain causing someone to have an urge to void." *See id.* at 4-5.

On either March 23 or April 2, 2004, Zorn received the InterStim implant, which improved Zorn's voiding significantly. *See id.* at 5, 27. By April 14, 2004, Dr. Evans noted that Zorn was voiding "between 27 and 31 times a day." *See id.* at 5. *But see* Doc. 63-3 at 3329 (noting that, *immediately after* implanting first stage InterStim, Zorn's "frequency [was] dropping down into the range of 6-10 a day"); *id.* at 3335 ("[I]f [Zorn's] frequency would drop down to 10-12 times a day, he might be able to work in an office setting but at this time, he really is chained to the bathroom."); Doc. 65-2 at 24 (Dr. Evans Affidavit) ("[Zorn] is now voiding in the range of between 6 and 10 times a day and his nocturia has

plummeted."). This was down from Zorn's normal average of 54-59 times in one day. *See* Doc. 63-3 at 3320, 3325. Dr. Evans also found that Zorn exhibited signs of "marked sleep deprivation and mental fatigue." *See* Doc. 65-2 at 20 (Dr. Evans Affidavit).

On April 19, 2004, Dr. Evans reviewed and completely disagreed with Dr. Patterson's evaluation. *Id.* at 3324. Dr. Evans wrote:

> It has been my experience that when [Zorn] is in my office, he spends all of his time on his back, on his side and is not able to sit up in a normal fashion. I generally have to perform by [sic] conversations with him in this position. It has not been my experience that he can sit in a chair and have what I would consider a normal medical interview.
>
> Under these circumstances, I believe the assessment provided to you by Dr. Patterson is unduly optimistic. I will once again refer you back to the objective information obtained from the voiding diary which even with aggressive therapy including the Interstim has not decreased his frequency to any significant degree. Certainly if his frequency would drop to 10-12 times a day, he might be able to work in an office setting but at this time, he really is chained to the bathroom. I would consider him to be totally disabled at this point.

*Id.* at 3325. Dr. Evans concluded that Zorn was disabled due to his "urinary frequency and urgency," "severe and intractable pain," impaired cognition caused by the potent narcotic medication Zorn takes to deal with his condition, pain while in a sedentary position, stress, irritable bowel syndrome, and depression. *See* Doc. 65-2 at 8-10 (Dr. Evans Affidavit).

Since 2004, Dr. Evans has seen Zorn seven more times, including once to install a new InterStim implant due to the malfunction of the first implant. *See id.* at 7.

On October 1, 2004, PLIC had Zorn's medical records reviewed by Dr. Jackie Stephenson, another independent urologist. *See* Doc. 63-3 at 2581. She indicated that she "would expect Mr. Zorn's activities to be as limited as described by Dr. Evans." *Id.* Regarding how she would proceed if treating an individual in Zorn's condition, Dr. Stephenson stated that she "would place no limitations on a patient with interstitial cystitis, but rather would allow them to do whatever they are capable. However, in a case as severe as Mr. Zorn, I have no difficulty envisioning Mr. Zorn as being as limited as described by Dr. Evans." *Id.* at 2582. She concluded, "I believe that narcotics are currently his only source of relief, and that he is disabled and incapable of sedentary work." *Id.*

On December 22, 2004, Dr. Evans wrote to PLIC that "Mr. Zorn is markedly incapacitated. . . . I believe that he is unable to sit up on a regular basis, and each and every time I have seen him since the April visit he has spent most of time in the recumbent position." *Id.* at 3149. Dr. Evans also noted that he felt Zorn's condition was unlikely to improve. *Id.*

In August 2005, Zorn and Chris met with the local Chamber of Commerce regarding decisions that "had cost [their] business a lot of money." *See* Doc. 68-1 at 42 (Chris Deposition). According to Zorn, he commonly accompanied Chris on client issues and investigations of agency purchase opportunities. *See* Doc. 69-1 at 125 (Zorn Deposition).

In his deposition on September 28, 2005, Rhett again averred that Zorn always handled major problems and negotiations at Zorn & Son, but that he did most of his work from home. *See* Doc. 63-3 at 3812, 3840-41. Rhett also stated that he noticed Zorn going to the bathroom frequently while Rhett worked at Zorn & Son, but that he observed no other physical disabilities. *See id.* at 3828.

Brian Bishop, an employee at Zorn & Son, stated in his deposition that Zorn would come to the office three to four times a week for an hour or more to handle whatever work needed to be done at the agency. *Id.* at 3774. Bishop also stated that Zorn would give advice, interact with customers, and hold meetings at the office. *See id.* Bishop stated that Zorn "was active when it came to any type of financial aspect of the agency." *Id.* at 3782.

On November 17, 2005, PLIC sent Zorn a letter indicating that, after undergoing an investigation of Zorn's claim and reviewing information he had previously provided, Principal was terminating his claim because he was no longer disabled. *Id.* at 2062. Principal cited his activity within his businesses, his management of the businesses, and his travel and leisure habits as evidence of his physical ability. *See id.* at 2063. PLIC advised Zorn of his right to submit to an administrative appeal of its decision. *See id.* at 2065.

On March 29, 2006, an investigator with the Georgia Department of Insurance called PLIC and informed them that Zorn's office had been searched and that computers had been seized. *See id.* at 2479. He also stated that Zorn had become licensed to sell insurance in Alabama and North Carolina in 1996 and 1997 respectively. *Id.*

In May 2006, PLIC received a copy of a video of a meeting at Zorn's church, at which Zorn appeared and spoke. *See id.* at 2368. Zorn appeared before and spoke to the church for nearly 20 minutes. *See id.* (Video).

7

On July 10, 2006, Integrity Rehabilitation & Testing, Inc. ("Integrity") performed an employability analysis on Zorn. *See id.* at 2323. The agency's analyst found that:

> within a reasonable degree of vocational certainty . . . Mr. Zorn's residual functional capacity as opined by unknown urologist on October 1, 2004 and Dr. Evans would preclude him from performing the essential job functions of any competitive job in a reliable manner. A worker who has to go to the bathroom as much as Mr. Zorn does would not be able to perform competitive work and would need an accommodated job with a sympathetic employer.

*See id.* at 2331. Regarding his education and experience, the analyst determined that "Mr. Zorn's educational level alone would allow him to qualify only for unskilled jobs. Mr. Zorn had a skilled and very skilled work history. He had acquired transferable skills to work at the sedentary and light exertional level within the insurance industry." *Id.* at 2330. The report concluded that "Mr. Zorn has and continues to meet the definition of 'disability' or 'disabled' as defined by Principal Financial Group." *Id.* at 2331.

Zorn began appealing his denial with PLIC on July 17, 2006. *See id.* at 2291.

Deborah and Chris gave depositions on December 6, 2006. *See id.* at 1, 560. At her deposition, Deborah stated that Zorn acted merely in an advisory capacity for Zorn & Son. *See id.* at 569. She stated that she did involve Zorn in agency finances. *See id.* at 570.

Chris stated that Zorn only occasionally went with him on sales calls. *See id.* at 15. He also identified a 2002 document as a check to Zorn for management services performed for the agency, but stated that he did not make the payment. *See id.* at 26-27. Chris also confirmed that Zorn accompanied him to other insurance agencies to explore purchase opportunities. *See id.* at 29. According to Chris, Zorn attended these meetings as an adviser only. *See id* at 30.

Chris, however, was the chief financial officer of the insurance company. *See id.* at 18. He handled the day-to-day operations of the business with Deborah. *See id.* at 62. He also employed a certified public accountant to advise Zorn & Son. *See id.*

On January 10, 2007, Zorn gave his deposition. *See id.* at 77. Zorn revealed that he filed a defamation suit against Rhett and Carolyn. *See id.* at 83-84. Zorn confirmed that the agency was paying for his cell phone. *See id.* at 90-91. He also confirmed that his home computer was connected to the agency's office, enabling him to do work from home. *See id.* at 93-94. Zorn stated that his limit for car travel would be approximately seven to eight hours of driving. *See id.* at 101. When shown a 2001 check for $25,079.79 that was made out to him, Zorn said he could not recall where the check came from. *See id.* at 189-90. He described himself as chairman of the board of Zorn & Son, Zorn Land, and PAC. *Id.* at 208-09. As chairman of the boards of these companies, Zorn acted as "a financial adviser." *Id.* at 209.

On July 12, 2007, Zorn forwarded a letter from Dr. Evans, which sought to explain his earlier statements to PLIC. *See id.* at 2067-68. In that letter, he wrote:

> I feel that Mr. Zorn is markedly incapacitated by his interstitial cystitis. I don't believe he is able to travel for long periods of time such as to our office which is an 8 or 10 hour trip one day without having to resume a recumbent position to try

and alleviate some of the pain caused by travel.

*Id.* at 2068.

On August 30, 2007, Principal mailed Zorn a letter indicating that it had completed a review of Zorn's termination and upheld its decision to terminate benefits. *See* Doc. 66-3 at 2. The review letter indicated that Zorn had been "observed at his office on numerous occasions," that he had "significant real estate interests," and that he had appeared before local zoning boards and performed "significant and time consuming work for his church." *Id.* at 6. According to the letter, these observations were enough to conclude that Zorn was no longer totally disabled and that he "is able to perform the material duties of his occupation or any job that reasonably fits his background and training." *Id.* at 8. PLIC noted that "[m]ost of Mr. Zorn's complaints are self-reported. Ultimately, the activities of Mr. Zorn seem inconsistent with his alleged limitations." *Id.* at 7.

Zorn filed this lawsuit on November 10, 2009. *See* Doc. 1.

On June 10, 2011, Zorn, Deborah, and Don Gibbs ("Gibbs") gave a affidavits. *See* Docs. 65-4 (Zorn Affidavit); 65-5 (Deborah Affidavit); 65-6 (Gibbs Affidavit). Zorn stated that every day he experiences pain, takes narcotic medication, goes to the bathroom frequently, appears sick, and cannot reliable concentrate. *See* Doc. 65-4 at 15 (Zorn Affidavit).

Deborah stated that Zorn's illness "started out gradually in the 1980s as occasional discomfort in his lower abdomen and progressed to chronic, daily pain which necessitates narcotic medication every day." *See* Doc. 65-5 at 1 (Deborah Affidavit). She averred that Zorn does not have the mental ability to focus on and handle a full-time job. *See id.* at 2. She claimed that his

disability has severely restricted his activities in, around, and out of the house. *See id.* at 4. According to Deborah, Zorn has great difficulty sleeping. *See id.* at 5-6. Deborah stated that Zorn has not operated heavy equipment since he has become disabled, but that she did recall Zorn occasionally operating a tractor. *See id.* at 7.

Gibbs, Zorn's best friend and pastor, stated that Zorn had to give up most of his duties with his church due to his disability. *See* Doc. 65-6 at 3 (Gibbs Affidavit). Gibbs noted that Zorn used to be very physically active, but that Gibbs never sees Zorn "doing any physical activity other than taking a walk and that is not often." *Id.* at 5. Gibbs also claimed that Zorn "is not nearly as sharp as he used to be." *Id.* at 5.

On November 7, 2011, this Court granted the parties' motion for permission to obtain an independent medical evaluation. *See* Doc. 85. The parties jointly recommended Dr. Jeffrey G. Proctor, "an Atlanta board certified urologist, who holds himself out as specializing in the treatment of patients with interstitial cystitis." Doc. 84 at 1. Dr. Jeffrey G. Proctor reviewed Zorn's records and examined Zorn on November 23, 2011. *See* Doc. 89-1. Zorn reported that he urinated at least twenty times a day, had nocturia every fifteen minutes, has severe urinary urgency, strains to void, and has severe urinary pain. *See id.* at 4. Zorn was laying down for most of his examination with Dr. Proctor. *See id.*

Dr. Proctor concluded that Zorn has "very severe interstitial cystitis." *Id.* Dr. Proctor also noted that Zorn is "on narcotic dependence in order to tolerate his intractable pain." *Id.* Dr. Proctor recommended a new treatment for Zorn, but stated that he "would not expect a miraculous relief of symptoms with [the] treatment." *Id.* Dr. Proctor ended his report by stating that "[u]nless new treatments

become available for interstitial cystitis, I believe that Mr. Zorn will remain totally disabled for the foreseeable future. Again, I do not believe that Mr. Zorn can perform any of the duties of his employment." *Id.*

On November 14, 2011, this Court ordered Zorn to submit to an independent employability analysis concerning his ability to perform the "material duties" of "any job that reasonably fits his . . . background and training." *See* Docs. 82; 88. The parties jointly recommended Kathryn W. Willard ("Willard"). *See* Doc. 87.

After reviewing a voluminous collection of documents submitted by the parties, Willard determined that Zorn "is unable to display the physical stamina necessary to function as an insurance sales agent." Doc. 89-2 at 22. She opined that:

> [f]or vocational purposes [Zorn] would need a job that would allow him to change positions at his own volition and be in charge of his work hours. . . . While owning Zorn & Son Agency, Mr. Zorn may have had the ability to change his positions as he needed, it is not felt that his availability to meet with clients on a sustained and regular basis was evident . . . .

*Id.* She determined that Zorn "has the ability to function in a limited capacity from mid morning until early evening on a fairly regular basis. This availability would equal part-time work if time involvement were the only consideration." *Id.* Willard did state that Zorn might be able to "continue work as a business investor and a manager of other workers." *Id.*

### III. ANALYSIS

#### A. Statute of Limitations

PLIC avers that Zorn's suit is barred by a contractual statute of limitations. *See* Doc.

63 at 2. "ERISA does not provide its own statute of limitations," and "[c]ourts either borrow a closely analogous state limitations period, or they apply a contractually agreed upon period, provided it is reasonable." *Bennett v. Metro. Life Ins. Co.*, 383 F. App'x 870, 872 (11th Cir. 2010). "[W]here the parties have contractually agreed upon a limitations period, borrowing a state's statute of limitations is unnecessary." *Fetterhoff v. Liberty Life Assurance Co.*, 282 F. App'x 740, 744 (11th Cir. 2008).

The insurance policy in this case provides that "no legal action may be started later than three years after [Proof of Disability] is required to be filed." *See* Doc. 63-2 at 31 (Insurance Policy). The plan further requires that such proof be sent to PLIC "within six months after the Eligible Person completes a Benefit Waiting Period," which according to PLIC was 30 days. *Id.* at 30; *see also* Doc. 63-16 at 22-23.

Zorn alleged a disability date of August 19, 1994 when he submitted his claim to PLIC. *See* Doc. 63-3 at 321. According to the policy, the last day that Zorn could bring suit was March 18, 1998. PLIC concedes that beginning the limitations period at that date would be unreasonable because Zorn had no reason to file suit. *See* Doc. 63-16 at 23.

PLIC, however, contends that the three-year limitations period commenced on November 17, 2005, the date that Zorn first received notice of discontinuation of his claim. *See id.* Thus, according to PLIC, when Zorn filed this lawsuit on November 10, 2009, he ran afoul of the November 17, 2008 deadline by nearly a year, and his claim is barred. *See id.* Zorn argues that the beginning of the limitations period should be equitably tolled until Zorn exhausted all administrative remedies on August 30, 2007, meaning that his November 10, 2009

complaint did not transgress the August 30, 2011 deadline. *See* Doc. 75 at 9.

An ERISA cause of action arises when an application for benefits is denied. *See Hogan v. Kraft Foods*, 969 F.2d 142, 145 (5th Cir. 1992); *Gray v. Greyhound Ret. & Disability Trust*, 730 F. Supp. 415, 417 (M.D. Fla. 1990). "It is well-established law in this Circuit that plaintiffs in ERISA cases must normally exhaust available administrative remedies under their ERISA-governed plans before they may bring suit in federal court." *Springer v. Wal-Mart Assocs.' Grp. Health Plan*, 908 F.2d 897, 899 (11th Cir. 1990). Courts measuring limitations periods from the date that claims are first denied "must take care to ensure the limitations period is reasonable and that the specter of the substantial compression of a Plaintiff's time to sue does not materialize." *See Ponstein v. HMO Louisiana Inc.*, 2009 WL 1309737, at *4 (E.D. La. May 11, 2009) (concerning limitations period purporting to arise when disputed care was first rendered).

Courts in this Circuit dealing with contractual limitations periods for § 1132(a)(1)(B) claims have determined that limitations periods are tolled until the end of an administrative review process. *See Amos v. Hartford Life & Acc. Ins. Co.*, 2009 WL 1804989, at *2 (N.D. Ala. June 24, 2009) ("[T]olling the limitations period, whether set by contractual provision or a borrowed state statute of limitations, until a plaintiff exhausts her administrative remedies best comports with the statutory language . . . ."); *Fetterhoff v. Liberty Life Assurance* Co., 2007 WL 1589539, at *2 (S.D. Ala. May 31, 2007) ("Such limitations periods are tolled for the period necessary for the claimant to exhaust his administrative remedies."); *Jeffries v. Trs. of Northrop Grumman Sav. & Inv. Plan*, 169 F. Supp. 2d 1380, 1382 (M.D. Ga. 2001) ("[T]he statute of limitations was tolled while Plaintiff exhausted his administrative remedies."). *But cf. Radford*

*v. Gen. Dynamics Corp.*, 151 F.3d 396, 400 (5th Cir. 1998) (holding that 29 U.S.C. § 1113 is a statute of repose for breach of fiduciary duty ERISA claims to which tolling does not apply).

Zorn exhausted all administrative remedies on August 30, 2007. *See* Doc. 66-3 at 2. The three year contractual limitation in this case ended on August 30, 2010. Zorn filed suit on November 10, 2009. Thus, the contractual limitation does not bar Zorn's claim.

### B. ERISA claim

#### 1. Standard of Review

This is a close case. "A plaintiff suing under [ERISA] bears the burden of proving his entitlement to contractual benefits." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998). Thus, "[t]he plaintiff must prove by a preponderance of the evidence that he is entitled to . . . disability benefits within the terms of the [Plan]." *Papczynski v. Conn. Gen. Life Ins. Co.*, 730 F. Supp. 410, 413 (M.D. Fla. 1990).

"A denial of benefits under an ERISA plan must be reviewed de novo 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1549 (11th Cir. 1994) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

PLIC concedes that the plan contains no explicit grant of discretionary authority, *see* Doc. 63-16 at 24-25, and this Court reviews PLIC's denial of benefits de novo to determine whether Zorn "satisfied the definition of 'disability' under the [PLIC] plan." *See Ecklund v. Cont'l Cas. Co.*, 415 F. Supp. 2d 1353, 1369 (N.D. Ala. 2005). "A decision is 'wrong' if, after a review of

11

the decision of the administrator from a de novo perspective, the court disagrees with the administrator's decision." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008). "In this circuit, a district court conducting a de novo review of an Administrator's benefits determination is not limited to the facts available to the Administrator at the time of the determination." *Kirwin v. Marriott Corp.*, 10 F.3d 784, 789 (11th Cir. 1994).

Thus, the inquiry in this case is whether Zorn has shown by a preponderance of the evidence that his interstitial cystitis disease has rendered him unable "to perform the material duties of his or her occupation (while under the care of a Physician) . . . at any job that reasonably fits his . . . background and training." *See* 63-2 at 12 (Insurance Policy). The Court holds that Zorn has satisfied this burden.

The insurance policy defines "Disability" or "Disabled" as

An Eligible Person's inability, because of sickness or accident, to perform the material duties of his or her occupation (while under the care of a Physician):

a. for the first five years of disability, at his or her normal job; and

b. following the first five years, at any job that reasonably fits his or her background and training.

*See id.* at 12. The policy does not define "material duties," and to the extent that the term is ambiguous, this Court applies the principle of contra proferentem and construes the ambiguity against the drafter of the document, PLIC. *See Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.*, 41 F.3d 1476, 1481 (11th Cir. 1995); *Freling v. Reliance Standard Life Ins. Co.*, 315 F. Supp. 2d 1277, 1287 (2004).

Zorn claimed that the following are the material duties of his work:

(1) Engage in conversations with customers, both by phone and in person at the office, regarding insurance matters; (2) Engage in conversations with insurance company representatives, primarily by phone, regarding insurance applications, coverages, claims and other matters; (3) Completion of appropriate documentation, such as policy applications, both for customers and insurance companies; (4) Make personal calls on business customers at their business locations to consult with regard to insurance needs and coverages; (5) Supervise other salesmen/producers, office secretaries and clerks; and (6) Review financial documents and reports, both from insurance companies and in-house documents.

*See* Doc. 65-4 at 14 (Zorn Affidavit).

After a de novo review of the evidence, the Court disagrees with the administrator and determines by the preponderance of the evidence that Zorn is unable to perform these material duties for more than a few hours at a time.

### 2. Medical Evidence

The objective medical evidence in this case conflicts with PLIC's determination. Dr. Evans, Zorn's treating doctor with regards to his interstitial cystitis and his pelvic floor dysfunction, has opined, on numerous occasions, that Zorn is disabled within the meaning of the policy. *See* Docs 63-3 at 3325 ("I would consider [Zorn] to be totally disabled at this point."); *id.* at 3149 ("Mr. Zorn is markedly incapacitated. . . . I believe that he is unable to sit up on a regular basis, and each and every time I have seen him since the April visit he has

spent most of time in the recumbent position."). *But see id.* at 3329 (noting that, *immediately after* implanting first stage Interstim, Zorn's "frequency [was] dropping down into the range of 6-10 a day"); *id.* at 3335 ("[I]f [Zorn's] frequency would drop down to 10-12 times a day, he might be able to work in an office setting but at this time, he really is chained to the bathroom."); Doc. 65-2 at 24 ("[Zorn] is now voiding in the range of between 6 and 10 times a day and his nocturia has plummeted."). Dr. Evans reached this conclusion due to Zorn's "urinary frequency and urgency," "severe and intractable pain," distraction caused by potent narcotic medication, pain while in a sedentary position, stress, irritable bowel syndrome, and depression. *See* Doc. 65-2 at 8-10 (Dr. Evans Affidavit).

Dr. Conner, Zorn's regular physician and the physician who prescribes his medications, has reached a congruent conclusion. *See* Docs. 63-3 at 3360 ("If however these [other treatment options] fail to control his symptoms it would be difficult to see him performing even sedentary work given the medications he currently requires."); 65-3 at 4 ("Mr. Zorn is totally disabled and unable to perform the work required of any job of which I am aware.").

The Court is aware of the possibility that Zorn's physicians are relying and basing their opinions solely on Zorn's descriptions of his symptoms. *See, e.g., White v. Life Ins. Co. of North America*, 377 F. App'x 562, 562 (8th Cir. 2010) (citing cases approving courts' exercise of no deference towards medical opinions unsupported by objective facts); *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004) ("Most of the time, physicians accept at face value what patients tell them about their symptoms; but insurers . . . must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk).").

The record, however, indicates that Zorn's physicians relied on more than his subjective reports. The fact that Zorn was willing to undergo surgery and implantation of the InterStim provides some objective evidence of Zorn's condition. Furthermore, Zorn's willingness to adopt and use self-catheterization techniques also confirms the doctors' opinions. *See Doc.* 65-2 at 4.

PLIC relies in part on the independent analysis of Dr. Patterson, who concluded that Zorn is not disabled. The Court, however, finds that his opinion was not supported by objective evidence sufficient to surmount the opinions of Zorn's physicians. Dr. Patterson only met with Zorn once for an hour and forty-five minutes. *See* Doc. 63-3 at 3433. Dr. Patterson is not a specialist in Zorn's illnesses. *See id.* at 3430. Dr. Patterson's lack of expertise in interstitial cystitis makes his opinion even more conspicuous in its solitude as PLIC's lone expert support. *See Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 538 (9th Cir. 1990) (holding in a different ERISA context that an administrator's inadequate investigation and reliance on non-experts in the field failed to provide a reasonable basis for the administrator's determination).

The opinions of Dr. Evans and Dr. Conner, as Zorn's treating physicians, are also more likely to be reliable than that of Dr. Patterson. *See Johnson v. Metro. Life Ins. Co.*, 2008 WL 2302693, at *12 (N.D. Ga. May 30, 2008) (stating that although treating physicians' opinions are not per se entitled to special deference, "common sense and a stream of legal precedent suggest . . . factual determinations of a treating physician *are* objectively more reliable" (quoting *Burt v. Metro. Life Ins. Co.*, 2005 WL 4712457, at *11 (N.D. Ga. Sept. 16, 2005))).

Furthermore, independent medical reviews confirm Zorn's disability. An

independent review performed by Dr. Stephenson rebutted Dr. Patterson's conclusion. *See* 63-3 at 2582 ("[I]n a case as severe as Mr. Zorn, I have no difficulty envisioning Mr. Zorn as being as limited as described by Dr. Evans."). She indicated that she "would expect Mr. Zorn's activities to be as limited as described by Dr. Evans." *Id.* at 2581. She concluded that she "believe[d] that narcotics are currently [Zorn's] only source of relief, and that he is disabled and incapable of sedentary work." *Id.* at 2582.

Dr. Proctor, a physician agreed upon by the parties, concluded that "[u]nless new treatments become available for interstitial cystitis, I believe that Mr. Zorn will remain totally disabled for the foreseeable future. Again, I do not believe that Mr. Zorn can perform any of the duties of his employment." Doc. 89-1 at 4; *see also* Docs. 84; 85.

Thus, the majority of the medical evidence in this case supports Zorn's claim.

### 3. Zorn's Day-to-Day Activities

The evidence in this case regarding Zorn's activities indicates that, while Zorn did perform work for Zorn & Son, Zorn Land, and PAC, he did so in a limited capacity, and his condition prevented him from performing the material duties of both his previous job and "at any job that reasonably fits his . . . background and training."

The Court concludes that Zorn was still involved in the financial aspects of his businesses. *See* Doc. 63-3 at 3774, 3782 (Brian Bishop stating Zorn would come to the office three to four times a week for an hour or more to handle whatever work needed to be done at the agency, and that Zorn "was active when it came to any type of financial aspect of the agency"); *id.* at 570 (Deborah stating that she did involve

Zorn in the insurance company's finances). Nevertheless, Zorn did this work mostly at home due to his disability, and in a limited capacity. *See* Doc. 63-3 at 3812, 3840 (Rhett averring that Zorn handled major problems for the agency, but that he did most of his work for the agency at home).

PLIC's own surveillance indicates that Zorn's activities at the insurance office were limited. *See* Docs. 66-10 at 5 (observing Zorn at insurance office for approximately two hours on a Monday and four hours on a Thursday). Zorn visited the insurance office on only two of nine days PLIC conducted surveillance on him. *See* Docs. 66-10; 66-11; 66-13. The surveillance also failed to discover whether Zorn did work at the office at all. See Docs. 66-10; 66-11; 66-13.

Zorn's other activities outside of the office indicate only intermittent involvement in work activity. *See, e.g.*, Doc. 63-3 at 15, 29-30 (Chris indicating that Zorn would accompany him on sales calls, but only in an advisory capacity); *id.* at 2368 (video of Zorn speaking to the congregation of his church for approximately twenty minutes); *id.* at 3435, 3439-44 (reporting Zorn's attendance at city council meetings).

The fact that Zorn renewed state licenses and appointments is not proof of his ability to perform the material duties of his job. *See, e.g.*, Docs. 69-1 at 1 (1996 renewal of non-residential agent appointment in South Carolina); 63-5 at 4 (1997 renewal of Alabama license). Although working in a professional field is certainly one reason for obtaining a license, Zorn offered another possibility: he may have sought a license in hopes of recovery and one day returning to his insurance business as a full-time employee. *See* Doc. 69-1 at 1. The Court ultimately finds Zorn's act of applying for a license does not imply that he had the physical ability to perform the material duties of his position.

Conflicting affidavits and accounts obfuscate the state of Zorn's physical capabilities. On the one hand, the affidavits of Zorn, Deborah, and Gibbs indicate that Zorn is in great physical pain and rarely gets out of his home. *See* Docs. 65-4; 65-5; 65-6. The Court recognizes that these witnesses have a motive to give testimony beneficial to Zorn, and considers their affidavits appropriately.

On the other hand, the strongest evidence that Zorn worked more than sparingly at any of his businesses comes from Rhett and Carolyn. *See* Doc. 63-3 at 3690-92 (Carolyn reporting that Zorn was working for Zorn & Son both in-office and at home, but primarily from his home after Carolyn confronted him about his work activity and his disability claim); *id.* at 3691 (Carolyn reporting that Zorn still owned and operated Zorn Land); *id.* at 2789 (Carolyn informing PLIC that Zorn was working at the insurance office "after lunch every day, because he does his other work in the mornings"); *id.* at 3337 (Rhett and Carolyn indicating that Zorn still did all of the record keeping for the insurance agency and that he spent many hours at the office in the last week of December 2003); *id.* at 3338 (Rhett and Carolyn indicating that Zorn ran PAC); *id.* at 3339 (Rhett and Carolyn stating that Zorn operated heavy machinery).

This evidence, however, is best seen in the light of the dispute between Zorn and Rhett. *See, e.g., id.* at 3457 (Carolyn stating that Zorn is thought of as a "crook" in the community who sues everybody). Zorn's decision to force Rhett out of Zorn & Son created bad blood between Zorn, Rhett, and Carolyn. *See* Docs. 65-4 at 6 (giving Zorn's reasons for forcing out Rhett); 63-3 at 3339, 3828-29 (Rhett explaining that Zorn had always wanted Chris to take Rhett's position). Thus, Rhett and Carolyn could conceivably desire to hurt Zorn's financial interests as a result. Because of the scarcity

of evidence showing that Zorn was working persistently and full-time and because of their motive to give hurtful testimony, the Court chooses not to credit Rhett and Carolyn's testimony over the weight of the evidence in this case.

### 4. Employability Analysis

Lastly, two employability analyses also support, albeit marginally, Zorn's claim. Integrity determined that "within a reasonable degree of vocational certainty . . . Mr. Zorn's residual functional capacity as opined by unknown urologist on October 1, 2004 and Dr. Evans would preclude him from performing the essential job functions of any competitive job in a reliable manner." *See* Doc. 63-3 at 2331. This evidence confirms that Zorn is incapable of performing the material duties "at any job that reasonably fits his . . . background and training."

Willard, an employability analyst recommended to the Court by both parties, determined that Zorn "is unable to display the physical stamina necessary to function as an insurance sales agent" on account of his need for flexible hours, his inability to maintain a physical position for long durations, and his inability to meet with clients "on a sustained and regular basis." Doc. 89-2 at 22; *see also* Docs. 82; 87; 88. Although Willard did state that Zorn might be able to continue work "as a business investor and a manager of other workers," Willard did not opine in detail concerning Zorn's ability to perform the material functions of such positions in light of his ailments. *See* Doc. 89-2 at 22-23.

PLIC contends that the Court should not consider this evidence because "it in essence invades the province of the Court and seeks to instruct the Court as to how to decide the case." *See* Doc. 74 at 6. But "testimony in the form of an opinion or inference otherwise admissible is not objectionable

15

because it embraces an ultimate issue to be decided by the trier of fact." FED. R. EVID. 704(a). This testimony is no different from that of the medical experts in this case.

Accordingly, the Court considers the two employability analyses to support Zorn's claim.

After considering the medical evidence, the testimony concerning Zorn's day-to-day activities, and the occupational analyses, the Court finds by a preponderance of the evidence that Zorn was disabled within the meaning of the policy. Accordingly, the Court disagrees with and *REVERSES* the administrator's decision.

## IV. CONCLUSION

PLIC's "Motion for Judgment on the Record," *see* Doc. 63, is *DENIED*.

Zorn's "Motion for Summary Judgment," *see* Doc. 65, is *GRANTED*. The Court reverses the administrator. *ZORN IS ORDERED TO SUBMIT A BRIEF ON THE ISSUE OF DAMAGES WITHIN SEVEN (7) DAYS OF THIS ORDER. PLIC IS ORDERED TO SUBMIT ITS RESPONSE WITHIN SEVEN (7) DAYS OF ZORN'S FILING.* The Court will not accept any replies.


This 12th day of January 2012.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA